Good morning, your honors. Pete Piscopo for the appellants. May it please the court. I guess basically what we need to discuss here today is the question of whether we should apply Williamson County to our LUPA and whether the estoppel position of the plaintiff will work. What I'd like to do, not trying to recreate what's written in the briefs, but I want to go through a little bit of what happened over this long period of time from 1940 all the way to the present and kind of weave in the factual issues that relate to either the Williamson issue or the estoppel question. I'm sorry. What are the two issues? Well, I think they're kind of interrelated, but I think the question is, should the Williamson County final determination rule be applied to the statute or LUPA? The other one would be whether the estoppel position that the plaintiff has been pursuing in the district court works under the facts. And I think both of those issues are facts intensive. And are those the two issues that were presented to the district court? Yes. So there was not a third issue of whether there was an existing permit, a third separate issue as to whether there was an existing permit. The discussion of the existing permit was embedded in the estoppel point, correct? Well, excuse me for interrupting. I think that it applies to both Williamson and the estoppel. Okay, it applies to both. And it's factually, and it is a legal issue, but it's kind of, it falls under the rubric. It falls under both, but it wasn't the third issue presented to the district court as an independent claim. It was independent, but the court did rule on that issue. I mean, the court took it into consideration, and it was something that was pressed. My reading was it took it into consideration as part of the estoppel analysis, right? Yes. But I think it does play into Williamson, too. Oh, no, it goes into both. You had two issues before the district court, not three, you just told me, right? Yes. Sub-issue clearly is the question of whether there was a MUP in place. The interesting part about that is that the judge at the district court, we filed objections to the county's sole expert that was improperly designated, and the court did not allow that testimony. So what we're left with in regards to the issue of whether there was an MUP in place is the testimony of three separate experts, one of whom, Bud Gray, was one of the individuals who participated in the writing of the ordinance, which is integrated in all of this. Whether there was a permit in place, you know, a legally valid permit in place, is that a factual question or a legal question? I think I misstated the way I really want to put it to the court. The question is, was religious exercise an allowable use? That's really what the experts, and that is both, that's a factual issue, I believe, because there had to be evidence presented to explain to the court, what did the map say, what does the ordinance say, et cetera. I know I'm in the Ninth Circuit, not in the First Circuit, or the Second Circuit, that decided Marx versus Diners Club, but there's a general rule that I'm familiar with that experts can talk about practices, but not about legal conclusions. And so I read some of the expert affidavits, and they did, it seemed to me, do a nice job to go through and educate the judge on what was on each document, you know, what it said, point out when it mentioned church. But when it got down to the last paragraph, and it said, is a permit, or it's a permissible use, I wondered whether that, let's see, I'm looking at paragraph 28 of one of the declarations. Is it buzzed? Gray, I think? Yes. It says, since the Planning Commission approved the modification of P71, and the plot plan clearly identified the building as existing church, I thought those were facts on the 1979 plot plan. Then it goes on to say the church use was recognized as an approved land use by the county. I thought that sounded to me like a legal opinion. Well, it's no different than, I don't think it is for the following reason. It's a land use issue. In other words, what, it's no different than anyone at the county looking at the records and saying, well, this building here looks like it's a church, you know, is it allowable? They're going to go and they would look at the plot plan, the maps, et cetera, et cetera, which is what the experts did. And they'll draw a conclusion from that. You know, is it not allowed or is it permitted? In fact, the county did that in both in the April 16, 2008 letter and the same thing in the May 30, 2008 letter where they said, by the way, get out. And they made that decision based on their review of the maps of the, I assume, the assessor's records, et cetera, et cetera, the same records that all three experts reviewed in this case. And that's one of the reasons I think that Judge Miller is an excellent judge. He's a public servant in San Diego. I just think he made a mistake by making it into a motion to dismiss on his own because I believe that it creates reversible error in the sense that your Honor is picking up on, on whether this question should have just been presented to the jury. Hey, you know, we have all these documents and they say church on it, yet we have the county coming in here and saying, you guys got to get out. I think that's an issue for a trier of fact. And the court, when it switched to the court. You may want to get to some of the other aspects of this case. One of the questions that I'd like you to address, whether we're under Williamson or some other test of rightness, since this is what the district court ultimately decided that it wasn't right. In the scoping letter, which is exhibit ER 491, I'm looking at 494, there is a paragraph that talks about project issue resolution process. And I would like you to address that in the context that my understanding is that your claim, to the extent you say there is a right dispute, hinges substantially on the fact that you, that the church would have to spend six-figure amounts in order to comply with this scoping letter. So if that is the essence of the substantial burden, is that you simply, the church simply cannot afford to proceed with this permitting process. Am I accurate about that? Yes. Okay, now, so that means then it is important to know whether that amount of money is really what is a true obstacle. The project issue resolution process says, in part, you have an opportunity to quickly and inexpensively have issues considered by senior county management, gives you the option, gives the church the option to present its grievances to them. That seems to be part of the decision-making process. So why was that process not followed if it wasn't? Correct, we did not go that route, Your Honor, and there is a very good reason for it. The cases say that in this particular situation, it should be pretty clear, and again, again, I think this is a trier-of-fact question. Just answer the question. I'm sorry. In the totality of the circumstances from what occurred from 1986 when the church first moved in all the way through in the behavior with the two cease-and-desist orders, the revocation of the certificate of occupancy without a hearing, followed by this monumental scoping letter, and I'll get to the reason why I say that, Your Honor, to answer your question, that this was apparent, at least to myself, that this was a grand waste of time. Did you argue in futility? Yes, I did. Did you argue that in the brief? I believe so, Your Honor, yes. That this process would have not produced any result? Precisely, yes. And how do we know this? It's very interesting if you just look at what occurred and the city's behavior. In come the April 14th and the May 30th cease-and-desist letters. The church stopped immediately. A lawful member of the community did not even do anything except stop and then started meeting in houses. I was brought in literally on the Friday before the Monday when we filed the lawsuit on August 4th. From that time frame, the county never raised any issue about going into that church and doing any kind of an inspection. In fact, there wouldn't have been any probable cause to that because there wasn't anything wrong with the outset that would lead them to believe there were problems. So we go, the church goes back after we file the lawsuit, and lo and behold, we get an ex-parte warrant issued to do an inspection. You would think that this place was suspected of having a methamphetamine lab in the place the way that they came in. There were gangbusters. Four sheriff's deputies, a locksmith. After I told counsel in the district court that we would be there, they showed up with all this force to show this. So when you look at all of these things together, and then you get a 27-page scoping letter, when you look at all of these things, a revocation of a certificate of occupancy, they did nothing for 40-something years about there's a church in there. And then from 1986 through 2008, they did nothing. They were in meetings. They knew there was a church. I mean, if they were so worried about the enforcement of the statute, why didn't they do anything? And then here we are. They go back to church on the Sunday. Tuesday, they go get a warrant. Thursday is the warrant, the enforcement of the warrant by way of the inspection. And I think it was less than 24 hours later, we get this letter saying there's numerous violations. And, by the way, we're revoking your certificate of occupancy. They didn't even serve us with the charges at that point and said don't you dare go back to church. We ceased again. And not until the judge issued a preliminary injunction in November were they allowed to go back. So when you look at all of these facts, clearly it comes with, I think the Manziel case is the case to look at, the Long Beach versus Manziel, which is the California Supreme Court case where the court talks about justice and right. You know, you can just look at a case. This is one of those cases where you can just look at it and say there is something here that is just not right. You're talking about, is that a futility case? No, that's more of a justice and right. In that case, it was a long proceedings having to do with public trust lands. But, anyway, the state allowed. Now that I'm reading California law, I thought that the Golden Gate decision might be more analogous but not helpful to you, where a single employee decades before said it's all right. And that wasn't, as I recall, a proper basis for finding equitable estoppel. Well, that's because in that particular case, that was the only thing that occurred. And that, in fact, did occur in this case. It was the entry into the church in 86. Cheryl Rice immediately started figuring out that we need a permit. She found out, yes, we need a permit. They told her. And it doesn't make it so just because they told her that. She went through the process. All the documents are in the record. And what has she told? She's told the same thing as in that particular case. But that's not the only factor in this case. If you go and look at Pastor Peterson's declaration, I don't know what the declaration is in the record, but he goes through all of the renovations that they made. They put roofs on. They put the canyon walls. They did a lot of upgrades. When you look at all of this in its totality, from this court's case in, this is the Christian gospel case cited by defense, but there's something in there that I think applies. This court said in Christian Gospel Church v. County of San Francisco, the burden on religious practice is not great when the government action, in this case the denial of a use permit, that's in that case, does not restrict current religious practice, but rather prevents a change of practice. Remember, they were going from a hotel to a home in that particular case. And they were stopped. In this case, which is why I think this is ironic that they cited this case, they had a complete cessation on this pain of $2,500 a day penalties and who knows what else. They stopped their religious practice. And Senator Kennedy and Hatch, they talked about this. That was the whole purpose of the RLUPA Act. And they said in their statement on passage of the Act, they said, churches in general and new, small, or unfamiliar churches in particular are frequently discriminated against on the face of the zoning codes. We don't have that in this case. And also in the highly individualized and discretionary process of land use regulation, often discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, and not consistent with the city's land use plan. You may ask who I reserve what little time you have for rebuttal. And in rebuttal, would you point me in your brief where you argued futility? I will. Thank you. May it please the Court, Thomas Bunton, Senior Deputy County Counsel, on behalf of the County of San Diego. Let me go right, Judge Wolf, to your questions regarding the maps that were at issue here and the expert opinion that was rendered in this case. In 71, they came in to get approval to use this building as a recreation building, not as a church. The county's planning commission approved it as used as a recreation building, not as a church. The map is not actually that was submitted in this case. They didn't produce a map that was approved by the county. There's no stamp indicating it was approved. In 78, they came in to modify the use permit for the RV park, having nothing to do whatsoever with the recreational building, having something to do with wanting to add some land in and to subtract to let some land out. The maps referenced a church. We deposed, and it's in the record, the owner in 78 and 79, LaFrance Bragg,  that it was a mistake. In 82, they came in to get a modification of the use permit to allow this building to be used as a facility to sell beer and wine. Again, there was no reference to a church. The church started using the building in 1986. Everybody from the church testified that at the time that they came in there, the building was vacant or had been used as a storage room for many years and was not being used as a church. Under the county zoning ordinance, which the district court recognized under Section 711 of the zoning ordinance, if a use is discontinued for more than a year, it expires. So at the time they located in this building in 1986, there can be no dispute as a matter of law, a legal conclusion, that they did not have the necessary permit needed to operate there. Let me ask you the same question I asked the appellant's counsel. Below, were there two issues for the district judge to decide on summary judgment or three? Was it equitable estoppel? Whether the issue of the new permit was ripe? Was it just those two issues or was there a separate third issue, not part of the equitable estoppel argument, that there was an existing permit? There's no allegations in the complaint whatsoever that there was an existing permit and therefore they were not needed. I believe the district court properly treated it as two issues and maybe the second one had two components to it. The first one, was the county estopped from requiring a major use permit? I think the district court then made a threshold determination under RLUPA that the county could require a major use permit, that RLUPA does not prevent a local entity from requiring a major use permit and that's well established under this court's decisions. In the San Jose Christian Church case, for instance, that permitting requirements are perfectly legal under RLUPA. The complaint does not allege, just to be clear following up on Judge Wolf's question, the complaint does not allege, nor was there proof submitted to the district court, that there was in fact a permit permitting the use of the building for religious activities. The complaint does not allege that. The proof that was submitted to the district court by both sides shows that that's not the case, that in 86, when they started using the building, they did not have a permit. We understand that their second issue is that the county estoppel theory based on long-term use and some statements folks may have made, but at no point in the proceeding did somebody hold up a piece of paper and say, we have a permit to use this property for religious purposes. No, Your Honor. The only argument even along that line was based upon these. The estoppel. Well, based upon these documents, these plot plans is the technical term for them. It was part of the estoppel argument that in part the judge rejected because there's no evidence that anyone connected with the church had ever even seen them prior to the commencement of this litigation. So they weren't relied upon. They'd never been seen before. So that's part of it as well. Moving on to the estoppel issue under California law, counsel talks about the fact that Ms. Rice attempted to turn in this application, according to her testimony, in 1987, but he neglects to point out the meeting that was then held in March or April of 1988 in which they were specifically told you need to get a major use permit. In fact, the letters from the owner, Mr. O'Flynn, he wrote the minutes. It wasn't the county writing the minutes. It's Mr. O'Flynn, the owner of the RV park, writing up the minutes, describing the meeting that occurred with two aides to a county board of supervisors and then a telephone conversation with a DPLU representative saying you need to get a major use permit. And then he takes even more steps and follows up on that in a letter that he wrote to the Department of Environmental Health inquiring about water issues in which he was attempting to process this permit application and he was told, well, you need to get an engineering report to satisfy that there will be sufficient water. And he said, look, I shouldn't have to do that. All we're trying to do here is to legalize existing use through the major use permit and I'm ready to pony up, in his words, the money in order to do that, but you're going to make this really burdensome on me if you make me go get an engineering report. And the county actually acceded to that request and said, fine, you don't need to do that. So go ahead and process your application. Never got processed. So, again, one of the fundamental elements of estoppel is that the party who's claiming estoppel has to be ignorant of the true facts. They were not ignorant of the true facts. They'd known since 1988 that they needed a major use permit and they simply did not get it. There's also no evidence of reliance here with respect to any of the particular elements or documents that they claim constitute a representation. And, again, the district judge correctly held that none of those things, that the tax bills, the permit to upgrade electric in any way was a representation by the county, you don't need a major use permit. They knew all along that they needed it and I think Judge Wolf, the ski club case, correctly on point, is a good case for the county here. And that's a case where there was a statement that was made, but there wasn't the follow-up meeting that occurred shortly thereafter in which the local government said, hey, you do need to get the permit. And there was a long period where there was no enforcement action taken, in that case, by the city. And numerous buildings had been constructed on this particular island and the ruling was tear them all down, eliminate them. And that ruling was approved on appeal. We're not talking about anywhere near that kind of draconian results here. We're just saying go through the permit process and get a permit. Was this futility argument raised about using this inefficient, inexpensive process to seek relief from the heavy cost of going all the way through the permitting process in the ordinary way? There was no futility argument raised, as I understand futility. And futility under the law, Judge Wolf, is when you can say that without doubt the decision maker has expressed its views on what it will do with your permit application. And if you're a plaintiff, that means that the decision maker has said it will be denied. That argument was never raised. It was not presented to the district judge? Never raised to the district judge. Now, what counsel has characterized as a futility argument is we can't afford to pay, and therefore so we don't have to go through this process. Now, they've categorized that as a futility argument. I don't agree. I think, well, at least what I'm interested in, I thought what Judge Fisher was getting at. There's something in the record that says there's a way. Is there something in the record that says there's a way to get guidance that's less expensive than the full permitting process? Well, I wouldn't say it's – there can be no exemptions from the full permitting process. Under California law, this is – Let's make it specific. It's in the scoping letter. Yes, in the scoping – The scoping letter invites any applicant, presumably, who is going through this process to go through this independent – or I mean this alternative way at least of addressing issues, administrative way. Well, it's a way to address issues involving the issues of compliance under California law. So you can come as an applicant and say, you know, you think you need to analyze this issue to comply with the California Environmental Quality Act. We don't think you need to. Here's some things that can be done instead to address that issue. And that was never done here, and I think that's admitted. Let me ask you this then. Do you disagree with their estimate that in order to comply with the scoping letter, it would cost somewhere between $200,000 and $300,000? We did not submit a declaration to contradict any of that information. And there's nothing in this project issue resolution process that you've just – and described that would likely impact the cost? It could impact the cost because if you determine, for instance, that an issue really didn't need to be addressed under CEQA, say water quality or sewer impacts, septic impacts, if you would make those kind of determinations and therefore those kind of environmental studies weren't required, then yes, it could impact the cost. So on the record, we don't know whether you haven't disputed the number that they estimate. There's a possibility it can come down if they follow this process. But let's assume for purposes of discussion that it would cost them $300,000 to go through this process, which they have absolutely no ability to pay. Why would that not be sufficient burden, concrete burden on them as a church that would at least make the matter right? Because these are generally applicable requirements. And it's clear under Mr. Gray's testimony, we cited it in the brief, that he testified that these are the kind of fees that would be required from any entity, church, Elks Club, Microsoft, anybody who came and wanted to get a discretionary permit approval would have to do this. And what dictates this... But Microsoft is not protected by federal law in that sense. True. And he said also that in virtually every community requires churches to get special use permits and that they would have to pay those sums to obtain the special use permit. And this is triggered because it's a discretionary decision. Discretionary decisions are governed by the California Environmental Quality Act, and therefore there has to be environmental studies done. Now, there are options under the county's ordinance where you can completely avoid that. There are areas within the county where you can locate your church as a matter of right. You don't need a discretionary permit at all. And in those areas, CEQA doesn't apply because CEQA only applies to discretionary determinations. So if you can locate there as a matter of right, you can avoid CEQA and you can avoid much of this cost. Would this be a different case if the church had filed for a permit and the county said, okay, to get this permit you have to do one, two, and three, and the church established concretely in the record that they simply couldn't afford to pay for one, two, and three. Would this be a different case? I don't think it would necessarily be a different case because, again, if they're generally applicable requirements across the board, RLUIPA and the case law is clear that cost burdens that are applied across the board are not a RLUIPA violation. And if you started exempting churches from paying costs that were generally applicable to everyone else, you'd have an establishment problem. Say that one step further. Let's say they not only said we can't afford that, the county then said, absent your meeting these conditions, your application for a permit is denied. And there's a piece of paper saying denied. Would this be a different case? I don't think so, Your Honor. I'm not talking about the merits. I'm talking about whether it would be ripe or not. Well, certainly not different with respect to the merits here under this circumstance because in San Jose Christian Church, the court says the denial of a permit application in and of itself isn't sufficient. But we're dealing with dismissal based on ripeness. Well, summary judgment based on ripeness, yes. So would this be a different case if that had happened? I think it's possible that that would be a different situation if you'd actually had a denial of the permit application. We don't have a denial here of the permit application. We have a situation where they're not proceeding with the permit application. But if, as a practical matter, an entity, a church, is unable to proceed, to take it to finality, then the question is does that make the matter ripe as far as determining whether it is ripe for the court then to go into the rationales that you're offering? I've never seen, Judge Fischer, a Williamson County case in which they said you don't have to proceed through finality if you can't afford to do so. I know, but see, Williamson County comes out of a regime where we're looking for a dollar amount at the end of the day because if it is a takings, then they're going to have to come up with just compensation. That's not the situation in this kind of a case. They're not looking for compensation. They're looking for the ability to practice their religion. So it's not clear to me why Williamson County straight across applies down to the notion of you have to, you don't get a ripe case to challenge the religious substantial burden unless you pay an admission ticket to federal court of $300,000. Again, I think there aren't a lot of cases applying Williamson County to RLUIPA cases, but they do exist. Every court that's considered have applied it. Again, I'm not aware of any exemptions with respect to the cost to go ahead and proceed with the finality requirement, and it would have the ability then to create a major exception to finality requirements if you could just claim that you couldn't afford the cost. And again, these are generally applicable costs applied to everyone. I continue to wonder whether we need to decide that issue. What is your position on whether if the church used the process described in the scoping letter, it would have the potential to eliminate issues and materially reduce the cost of any permitting process? Well, it's certainly possible, Judge Wolff, that that would happen, and we don't know because they didn't go through the process and attempt to do that. Almost all the costs, too, I should point out, my time is up, so I'll just conclude here. Almost all the costs that we're talking with here aren't costs to the county. They're not paying the county's fees. These are for outside environmental studies that are done in order to comply with California law, and they, of course, have lots of ability to control on their own end the cost associated with preparing these studies. They're the ones that hire the people to do them, and so the cost can be reduced on that end as well. Thank you. I'll answer the last question about where it is in the brief. It's in our reply brief, which is docket entry. Tell me the page. Oh, I'm sorry. Five through seven, and then there's a follow-up argument through page nine also in a different way, but it's the same type of feudal aspect of it. By the way, in the record also is the fact that in order to come to play, it was going to cost the, and that's in the scoping letter too, an additional $50,000. With the proviso, it could be more. So putting the $215,000, the $315,000 aside for a second, the church would have to pay experts to do all of this. There was also the additional $50,000 that's demanded in the scope letter along with the proviso that it could be more. There was no end to this. Now, I'd like to end with this. I'd like you, before you jump through that hoop, tell me where you argue in those brief pages, which is what I had previously been looking at, that there was no need to pursue the informal administrative process. There's no mention in there of that, is there? Yeah, there is.  I'm looking at your reply brief. Where does it talk about that clause and why you didn't? Specifically about that clause? Well, that's what the whole question came up. I said when you were responding to my question, did you pursue it, you said, no, because all of this history. And I said, did you make a futility argument? You didn't even address this clause in your brief. No, I didn't, Your Honor. Okay. Thank you. It would have been easier if you just said that. Thank you. Now, what else did you have? Back to the futility argument. We just need to look at this whole idea that the county keeps on talking about, this 1982 permit for live music and alcohol and all of that. That's only a couple of years before the church came into the building. How could it be that, remember, that expired. It never invested. Is this in your brief? Yes. Okay. Then let's not belabor the point. Well, the point is in my brief about the evidence. All right. Get to the point. Okay. The point is, if they approve that for that use, which is a higher intensive use because it's used seven days a week as opposed to just on Sundays, then how do we end up with this 27-page scoping letter for a building that was built in 1940 or 1930? That's why, in the totality of circumstances, we believe that the answer was going to be no. Okay. Thank you. Thank you. Thank you. The case is submitted. And that will bring us to Moore v. USC University Hospital.
judges: Wolf, Hawkins, Fisher